ALBERT YARDE *et al.*

*v.*

ELIZABETH YARDE.

*Opinion filed October 19, 1900—Rehearing denied December 6, 1900.*

1. ANTE-NUPTIAL CONTRACTS—*when ante-nuptial contract will be upheld.* An ante-nuptial contract giving the wife a comfortable home, free from taxes and cost of repairs, and an annual income of $200 for life, in lieu of her rights in the husband's property, worth about $25,000, will not be set aside as unfair, where the husband was a widower, eighty-one years old, with six living children, and the wife a widow fifty-one years old, who had supported herself and family prior to the marriage, and where she knew substantially the amount of the husband's property, and executed the contract with full knowledge of its effect upon her legal rights and to better her condition in life.

2. WITNESSES—*when wife is not competent witness in her own behalf.* In an action by a widow to set aside an ante-nuptial contract and

for assignment of dower and homestead, the complainant is not a competent witness to testify in her own behalf as to what was said or took place at the time the contract was signed, where the opposite parties are defending as heirs of her deceased husband.

APPEAL from the Circuit Court of Mercer county; the Hon. HIRAM BIGELOW, Judge, presiding.

GRIER & STEWART, for appellants.

BASSETT & BASSETT, and GEORGE B. MORGAN, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

The appellee obtained a decree in the court below setting aside an ante-nuptial agreement which had been entered into by her and her late husband, Aaron Yarde, and for the assignment of dower and homestead. Her contentions of fact as set forth in her bill and in the arguments of her counsel are, that when she entered into the contract, and at the time of the marriage, said Aaron Yarde owned personal property worth from $12,000 to $14,000 and real estate worth about $20,000, and that she had no knowledge of his personal property or its value; that he kept that matter a secret from her; that she did not know the extent or value of his real estate, any further than the knowledge she had that he owned a farm of 160 acres and three lots in the village of Alexis, in Warren county; that after their engagement he procured her to execute the contract while she was ignorant of its effect and without any one to advise with about it; that he had represented to her that he only wanted a contract to enable his executors to settle his estate with little costs and with dispatch, and that, trusting in him and that he would be just to her, she signed the contract with him. This contract was dated and signed November 7, 1891, and was in the usual form of such agreements. It recited that a marriage was about to be solemnized between the parties; that each had children by former marriages and

that each desired that his or her property should descend to his or her own children, and it was agreed that he should take nothing from her estate in case he survived her, but that if she survived him she should have and hold for her life lot 1, block 4, in Alexis, which was his home place, and should have as her absolute property all of his household goods and furniture, useful and ornamental, in his said residence, and $200 per annum during the rest of her life, the first payment to be made within thirty days after his death. These annual payments were secured by a charge upon the rents of a certain 83-acre farm described in the contract, and it was provided that all taxes and repairs on the said farm and on said home place, or lot 1, should be borne and paid by his estate during her life. She agreed to accept the provisions thus made for her, in lieu of dower and widow's award and her homestead rights, and in full satisfaction and discharge of all other claims, rights and interests which she might otherwise have to or in his estate or by virtue of their marriage, and agreed also to sign and acknowledge any papers necessary, after his death, to carry into effect said agreement.

The evidence showed that Aaron Yarde owned, at the time the contract was made, 160 acres of land in Mercer county, worth $7200; 40 acres worth $2400, which had been devised to him by his former wife, Patience Yarde; lots 5 and 6 in Alexis, worth $200, which he used as a pasture for his horse; 83 acres in Warren county, worth about $4000; 17 acres worth about $1500; lots 2 and 3 in Alexis, worth $600, then leased and occupied by appellee; lot 1, worth $1200, the home of Mr. Yarde; and 80 acres in Iowa, the value of which was not shown. At the death of Mr. Yarde his personal property was of the value of about $14,000, but while the evidence on the question is meager it is to be inferred from the facts proved that about $6000 of this amount was accumulated after his and appellee's marriage, so that at the time of such mar-

riage the whole of his property, exclusive of the Iowa land, was of the value of $25,000 or upwards. She had no property except household goods worth $150. He was then eighty-one and she fifty-one years of age. He had six children,—two sons and four daughters,—all of mature years, one of whom, a widowed daughter, lived with and kept house for him in the interval of eight months between the death of his second wife and his marriage with appellee. Appellee, who had been a widow two years, had eight children, two of whom were minors and continued to live with her after her marriage with Mr. Yarde. She had supported herself and minor children by sewing and other work, and it is apparent from the evidence that her circumstances were greatly improved by her marriage. Mr. Yarde died in 1898, having made his will confirming the marriage settlement and bequeathing and devising all the rest of his property to his six children and appointing his two sons as his executors. They tendered to appellee the first payment of $200, but she refused to accept it and filed a claim against the estate for upwards of $3000,—$1000 of which was for services during her marriage and $2000 for her alleged share of accumulated earnings during the same period,—and at the April term of the Mercer circuit court, 1899, she filed her bill for relief in this case.

The contentions of appellee's counsel, in addition to actual deceit and fraud charged in the bill, are, that the contract did not make a reasonable provision for the support of the wife; that the parties occupied a confidential relation with each other, and that the burden of proof was upon appellants, as the heirs of the deceased, to prove that before entering into the contract he fully and fairly informed appellee of the character and value of all of his property, and that he failed in this duty, and she, being ignorant of the facts and of her rights in the premises, is not bound by the contract, but may have it set aside in equity as fraudulent in law and also in fact.

. We have held in several cases, that where the provision for the wife is disproportionate to the property of the intended husband it raises a presumption of designed concealment, and throws the burden upon those claiming in his right to prove that she had knowledge of the character and extent of his property, or that the circumstances were such that she reasonably ought to have had such knowledge at the time the instrument was executed. (*Taylor* v. *Taylor*, 144 Ill. 436; *Achilles* v. *Achilles*, 151 id. 136; *Same* v. *Same*, 137 id. 589; *Hessick* v. *Hessick*, 169 id. 486.) It may be conceded that, if the provision made for appellee in the contract and the extent and value of Mr. Yarde's property were alone considered, there was such a disproportion between the two as to call for affirmative proof on the part of appellants to overcome the presumption of concealment and unfairness; but from a consideration of all of the competent evidence in the record we are of the opinion that the contract was not really unfair to appellee, and that, before entering into the contract sought to be set aside, appellee had knowledge of the character and extent of, substantially, all of Mr. Yarde's property, or, at all events, that the circumstances proved were such as to charge her with such knowledge.

There is no evidence to establish the charge of actual fraud or deceit in respect to the purpose of the contract or the amount of his property. It appears that Mr. Yarde went to Monmouth and called upon William C. Norcross, the county judge of Warren county, and asked him to prepare the contract, informing Norcross at the time of the provisions, in substance, which he and appellee desired should be incorporated in the instrument. Judge Norcross had not been Yarde's attorney, but drew the paper, and upon the day agreed upon went to Alexis and met Mr. Yarde at appellee's house, where he read the agreement to both of them at the same time,—some parts of it twice,—and fully explained it. Judge Norcross testified that he considered that he was acting as much for

appellee as for Mr. Yarde, and also that he fully and truthfully explained to her her rights under the law and what they would be under the contract; that in response to questions put by appellee he informed her what the legal rights of a married woman were,—explained her right of dower, of homestead and widow's award, and to one-third of the personal property, after payment of debts, upon her husband's death; told her that in case they were married without any ante-nuptial contract her widow's award alone would probably be about $1000. She remarked that she would get more in event of marriage without the contract, and was then told that she would get more under the statute out of the personal property alone than the contract would give her. Mr. Yarde then said to her: "Now, if you think you would not be bettering your condition by signing it, do not sign it. I do not know whether you would be bettering your condition or not." He also said at the same time that they had never talked of marriage on any other basis; that he had several daughters with large families and that he did not feel that it would be right for him to make a greater provision for her than the contract provided for; that he could not do it and be just to his children. He also explained what property he contemplated leaving to his children and spoke of his intention to make a will. Appellee and Mr. Yarde had been well acquainted with each other for a great many years. She was at the time of the marriage, and had for many years been, his tenant, occupying a house owned by him on lots 2 and 3 in Alexis, just across the street from his own residence. At different times he and his former wife had boarded with her. The families were intimately acquainted. He had for a long time been known in the village and by her as a man well off financially. It was testified that she said she married him because he was a nice old man with plenty of money. While it was not affirmatively proved that he made to her a specific enumeration of the

property which he possessed and stated its value, we are satisfied, from all of the facts and circumstances proved, that she knew, or ought to have known, that he possessed real and personal property substantially of the amount and value shown by the evidence.

The allegation of the bill that an engagement to marry already existed between the parties at the time the contract was made, and independent of it, was not established, but the evidence tends to show that there was no agreement to marry except upon the basis of the ante-nuptial agreement. Nor, aside from appellee's own testimony, was there any evidence of any concealment or deceit whatever on the part of Mr. Yarde, nor any improper means used to induce her to sign the contract, but that she executed it freely, with full knowledge of the effect it would have upon her legal rights, as the widow of Mr. Yarde, in case she should survive him, and that she did so to improve her own condition in life. She fully understood his reasons for not giving her a larger proportion of his property; knew of his desire to avoid injustice to his children and of his especial wish to provide for his daughters, two of whom were widows with children, needing his assistance. She knew of his advanced age and that in the course of nature he could not live many years, but that she would be well provided for while he did live and would have a comfortable and well furnished house, freed from taxes and the cost of repairs, besides an annual income of $200, during the rest of her life. The provision thus made for her comfort and support was greater than the income from the rest of the property would have afforded to each of Yarde's children. While the statute would have given her more, we know of no reason why her contract for less than the statutory provision, based upon the consideration of marriage, fairly entered into, should not bind her. Besides, under all of the facts shown we cannot regard the provision so made by this contract as unreasonable, but

are inclined to the same view expressed to the appellee by Mr. Yarde, that had he given her a greater amount of his property he would have done injustice to his children. At any rate, such was the deliberate contract of the parties fairly entered into, and it should not be lightly set aside. She must abide by it.

There was error, also, by the court below in allowing appellee to testify as a witness in her own behalf. The opposite parties were defending as heirs of her deceased husband, and she was not competent to testify to what was said or took place at the time the contract was signed. Counsel for appellee admit this, but say the court did not consider her testimony. From the decree rendered it seems the court must have considered her testimony, for without it the decree should have been for the defendants and the bill dismissed. We are not unmindful of the principles announced and settled by the cases cited *supra* and relied on by appellee, but the facts in those cases differ widely from the facts in this case, and the principles of equity there stated do not require an affirmance of this decree.

The decree is reversed and the cause remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions.*