## LEONARD v. PRENTICE et al.

No. 25571.    April 16, 1935.

P. D. Sullivan and H. W. Sitton, for plaintiff in error.

L. A. Winans, J. B. Dudley, Cham Jones, and J. W. Marshall, for defendants in error.

PER CURIAM. Appeal from judgment for defendants in error in action commenced by plaintiff in error. The parties will be referred to as in the trial court.

On February 6, 1920, an antenuptial contract was entered into between B. T. Leonard, also referred to as Bascom T. Leonard, of the first part, and the plaintiff, Lucy B. Alexander, of the second part, as follows:

"This contract and agreement, made this 6th day of February, 1920, by and between B. T. Leonard of the first part and Lucy B. Alexander of the second part:

"Witnesseth: Whereas a marriage is contemplated by and between said parties and their mutual rights, obligations and desires having been fully considered, they hereby mutually covenant and agree each with the other, to which they respectively bind themselves, their heirs, executors, administrators and assigns, as follows:

"The said B. T. Leonard (intended husband) in consideration of the promise of the said Lucy B. Alexander (intended wife) to marry him and on the consummation of said promised marriage and of her agreements herein contained, covenants and agrees that upon the consummation of said promised marriage, he will pay, cause to be paid, or provide that there shall be paid to her the sum of $500 in good and lawful money of the United States, and that he will upon his decease pay, cause to be paid, or provide that there shall be paid to her within one year from his death the further sum of $1,000 in good and lawful money of the United States; and she, the said Lucy B. Alexander (intended wife), in consideration that said contemplated marriage be consummated and of the covenants of said B. T. Leonard hereinbefore contained, covenants and agrees to and with said B. T. Leonard, his executors, administrators and heirs, that she will, upon the consummation of said promised marriage, take and receive said sum of $500 and that upon the death of the said B. T. Leonard, she will take and receive the said further sum of $1,000. in full of all rights of dower in or to his estate and in full of all other rights, interests, claims or allowance in law or in equity, into or upon his estate, real and personal, which she might or could have or be entitled to but for this agreement:

"That on payment to her of said sum of

$500 upon the consummation of said promised marriage, and the further payment to her of said further sum of $1,000 by the executor of the will or the administrator of the estate, or by the heirs of said B. T. Leonard, upon his death, or within one year thereafter, she will release, quitclaim and discharge to his representatives or heirs, all rights, claims, interests, in law and equity, which she might or could have in or to his estate or property, real or personal, or any part thereof, but for this agreement.

"To which covenants and agreements, said parties mutually bind themselves, their heirs, executors, administrators and assigns.

"B. T. Leonard
"Party of the First Part.

"Lucy B. Alexander
"Party of the Second Part.

"Witnesses:
"P. G. Ward
"J. A. Coursey

"Acknowledgment.

"State of Texas, County of Johnson, ss.

"Before me, P. B. Ward, a notary public in and for said county and state, on this day personally appeared B. T. Leonard and Lucy B. Alexander, to me known to be the persons whose names are subscribed to the above and foregoing instrument, and acknowledged to me that they executed the same as their free and voluntary act and deed for the uses, purposes and consideration therein expressed and set forth, and they are personally known to me to be the identical persons who executed the within and foregoing instrument.

"P. B. Ward

"Notary Public. Johnson County, Texas."

"My commission expires June 1, 1921."
"(Seal)"

The marriage contemplated by the contract was consummated on the 6th of February, 1920, and thereafter, and on the 19th day of February, 1930, Bascom T. Leonard executed a will to which the antenuptial contract was attached as "Exhibit A". The testator directed in said will that the contract be fulfilled and carried out by his executors and further provisions for second party to the contract were made in the will and in the codicil to the will, in addition to the payments provided to be made under the provisions of the contract. The will was duly probated, but the county court in the probation of the will concluded that it was without jurisdiction to consider the objections of Lucy B. Leonard to the antenuptial contract, and did not pass upon or consider said objections, which were substantially the same as presented to the trial court in this cause.

The trial court, upon the conclusion of the evidence, determined that the plaintiff was not entitled to recover and denied her all relief.

1. A careful analysis of the evidence introduced and considered by the trial court in this case does not sustain the contentions made by the plaintiff that the court erred in deciding the issues against her. The plaintiff sought to impeach the contract by her own testimony to the effect that she executed the contract in haste one or two minutes before the marriage ceremony, did not read it, and did not know the value or extent of the husband's estate, and by the testimony of certain other witnesses to the effect that the husband had, long after the marriage ceremony, made statements to them contradicting the terms of the contract. Neither the notary public before whom the contract was acknowledged by the parties nor the witnesses thereto were produced nor any explanation offered why such witnesses were not produced. The contract was voluntarily executed by the plaintiff and acknowledged by her as her voluntary act and deed. The execution of the contract being admitted, and it not being unfair on its face, the burden rested upon the plaintiff to prove by satisfactory testimony her claim that it was procured from her by fraud or duress.

Antenuptial contracts are expressly authorized by the statutes of this state. Section 1539, Okla. Stats. 1931, reads in part as follows:

"Every estate in property may be disposed of by will; provided, however, that a will shall be subservient to any antenuptial marriage contract in writing. * * * "

This court In re Cole's Estate, 85 Okla. 69, 205 P. 172, said in the opinion:

"The antenuptial contract not being denied, the court erroneously cast the burden of proof upon the plaintiff in error."

It was held in Hoard v. Jones (Kan.) 237 P. 888:

"The fact that the plaintiff was unable to read, or that it is not affirmatively shown that the contract was read to her at the time she executed it, do not in themselves indicate fraud * * * its voluntary execution being admitted."

Antenuptial agreements between parties of mature age and understanding will be upheld by the courts and be given fair and reasonable interpretations, and such was the holding of this court in Watson v. Stone, 68 Okla. 33, 171 P. 336. To the same effect

is Hafer v. Hafer, 33 Kan. 449, 6 P. 537; Keller v. Keller, 121 Kan. 520, 247 P. 433.

The Supreme Court of Illinois in Yarde v. Yarde, 187 Ill. 636, 58 N. E. 600, applied the rule as follows:

"* * * We are satisfied, from all of the facts and circumstances proved, that she knew, or ought to have known, that he possessed real and personal property substantially of the amount and value shown by the evidence.

"The allegation of the bill that an engagement to marry already existed between the parties at the time the contract was made, and independent of it, was not established; but the evidence tends to show that there was no agreement to marry, except upon the basis of the antenuptial agreement. Nor, aside from appellee's own testimony, was there any evidence of any concealment or deceit whatever on the part of Mr. Yarde, nor any improper means used to induce her to sign the contract, but that she executed it freely, with full knowledge of the effect it would have upon her legal rights as the widow of Mr. Yarde, in case she should survive him, and that she did so to improve her own condition in life. * * * She knew of his advanced age, and that in the course of nature he could not live many years, but that she would be well provided for while he did live, and would have a comfortable and well furnished house, freed from taxes and the cost of repairs, besides an annual income of $200, during the rest of her life. * * * At any rate, such was the deliberate contract of the parties, fairly entered into, and it should not be lightly set aside. She must abide by it."

To like effect is the opinion of the Supreme Court of Michigan in the case of Richard v. Detroit Trust Co., 257 N. W. 725, in which the court, in paragraphs 1 and 3 of the syllabus, used the following language:

"Antenuptial agreement surrendering all of intended wife's claim to intended husband's property was supported by consideration although containing no marriage promise and although husband was killed shortly after marriage, since until marriage, wife had nothing to surrender, and marriage constituted acceptance of offer to surrender and gave wife benefit of such acceptance.

"Where parties to an antenuptial agreement are of mature years and have full understanding of the meaning of the instrument, agreement, if based on sufficient consideration and in absence of fraud, is valid." Comstock v. Comstock (Ark.) 225 S. W. 621.

2. The evidence introduced in this cause fairly establishes that after the marriage ceremony was performed, the parties took up their residence at Duncan, Okla.. and that in 1923 the husband filed an action for divorce, and thereafter a settlement was effected between the parties and the action was dismissed. Again, in 1931 the husband filed another action for divorce, and after the making of a settlement this action was also dismissed. In the disposition of this last divorce suit, the plaintiff herein negotiated her own settlement with the husband's representatives, receiving a substantial sum in cash and a deed to their prospective home, and the provisions of the antenuptial contract were given consideration in such settlement. One of the witnesses, Cham Jones, testified as follows:

"A. As I recall, there was a divorce proceeding pending, and he came and talked to me about it, more just as a friend than as counsel; I wasn't representing him in the divorce proceeding, but he just wanted to get my advice about it. * * * Q. I will ask you whether or not you later, about that time, saw Mrs. Leonard? A. Yes, sir; growing out of the conversation I had with him, I went down to see Mrs. Leonard, a day or two later. Q. When you got down there to their home, did you have a conversation with her, with reference to the matter he asked you to talk to her about? A. Yes, sir. Q. State briefly what that conversation was. A. Well, the substance of it, I told Mrs. Leonard I had consulted with Mr. Leonard—in fact, he asked me to go down to the house and was sitting out on the porch at the time—about their troubles, and that he had told me that she wanted him to give her a deed, or deed to her the home here in Duncan, in addition to the provisions made for her in the contract. I told her that I had advised him that I thought he ought to do it, under the circumstances, and that he was perfectly willing to do it. in fact, he told me that he wanted to do that, and I said to Mrs. Leonard that 'if he carries out the agreement and complies with your wishes, he wants to know that this will be a final settlement of your property troubles.' I said to her, 'He is getting old; he is not strong, and he wants to avoid any further trouble with you about property rights, and wants to know that if he deeds you this piece of property, that that will be final and satisfactory.' Q. What did she say? A. Well, Mrs. Leonard agreed that that was all that she wanted, and said she wanted the home place, or the property they expected to occupy as a home, which was different from the property they were then living in—she wanted that deeded to her, and, as I recall, Mr. Leonard told me he would be willing to do that, and I think I so advised her, that he was willing to deed her that property. Q. And did she agree to that? A. Yes, sir."

Mr. L. A. Winans, attorney for the hus-

band and one of the attorneys for defendants, also testified, in substance, that he represented the husband in the last divorce case which was filed by him in 1931; that said case was settled, the husband paying to the wife $5,000 and deeding to her the home place. He also testified that in the preparation of the probated will and the codicil thereto, to which the antenuptial contract was attached as "Exhibit A", he consulted the plaintiff, and at the direction of the testator carried into effect her suggestions, and that she knew at all times of the antenuptial contract, and that the provisions thereof were given consideration in the determination of the provisions made for her in the will and the codicil thereto. Under such circumstances, the plaintiff is precluded from now asserting that the antenuptial contract is not binding upon her. The plaintiff in this case by procuring property settlements from her husband during his lifetime based upon the antenuptial contract, and by procuring beneficial provisions in his will based upon and in addition to the provisions of the antenuptial contract, may not in this action repudiate the contract. Volume 3, Elliott on Contracts, pp. 586, 587, secs. 2429, 2430; Erb v. McMasters, 88 Neb. 817, 130 N. W. 576.

In Oklahoma City General Hospital v. Weathers, 147 Okla. 25, 294 P. 98, this court, in the sixth paragraph of the syllabus, stated the rule as follows:

"A voluntary acceptance of the benefits of a contract is equivalent to consenting to all of the obligations arising from it so far as the facts are known or ought to be known to the person or corporation accepting the same."

To the same effect is the decision in McLaughlin v. Lagers, 99 Okla. 155, 225 P. 920, 921, wherein the following language was used:

"Where the testimony is sufficient to show that defendant stood in line with the benefits to be had from a contract, and impliedly, if not expressly, accepted and approved the services of the plaintiff, under the terms of the contract, he is bound by the terms under sections 5013, 5031 and 5162, Compiled Statutes 1921."

This court, in the case of Teuscher v. Gragg, 136 Okla. 129, 276 P. 753, 66 A. L. R. 143, announced the rule as follows:

"The maxim that one who comes into equity must come with 'clean hands' is based on conscience and good faith. The maxim is confined to misconduct in regard to, or at all events in connection with, the matter in litigation, so that it in some measure affects the equitable relations subsisting between the two parties and rising out of the same transaction."

3. While good faith should always characterize the preparation and execution of an antenuptial contract, such contracts are favored by the law, and when written instruments affecting property rights have been voluntarily executed and the lips of one of the parties to it have been sealed by death, the other party may not be permitted to testify that such contract should have contained different language or different provisions.

In this case the plaintiff undertook and to some extent was permitted to testify as to her understanding of the contract. She was not a competent witness to testify as to any agreement or understanding with her intended husband on that matter. Even if such testimony were considered and in connection with the evidence offered, it would still be insufficient to sustain the plaintiff's contention under the facts and circumstances in this case. The rule with respect to the competency of plaintiff to testify with respect to the contract is well established in this state against her contention. Section 271, Okla. Stats. 1931, reads in part as follows:

"No party to a civil action shall be allowed to testify in his own behalf, in respect to any transaction or communication had personally by such party with a deceased person, when the adverse party is the executor, administrator. * * *"

This statute has been given effect and construed by this court many times. In the case of Pancoast v. Eldridge, 157 Okla. 195, 11 P. (2d) 918, the court in the opinion stated:

"The true rule is stated in Northrip's Adm'r v. Williams (Ky.) 100 S. W. 1192, 1193: 'No person will be permitted to give testimony in his behalf against the estate of a deceased person that will have a tendency to strengthen or make good his claim, or that will leave the impression upon the court or jury that his demand must be just and reasonable, because in substance and effect this would be testifying, although indirectly, to transactions with and acts done or omitted to be done by the deceased.'

"This court stated this rule in Cunningham, Adm'r, v. Phillips, 4 Okla. 169, 44 P. 221, and followed in Wadleigh v. Parker, 34 Okla. 213, 124 P. 957; Okla. Nat. Bank of Cushing et al. v. Keller, Adm'r, 124 Okla. 281, 256 P. 34; Conklin v. Yates, 16 Okla. 266, 83 P. 910, 912, wherein it was said: 'To hold otherwise' as to transactions 'would open the door for the greatest fraud; and

this, because the lips of his adversary are closed by death.' MacDonald v. McLaughlin et ux., 32 Okla. 584, 123 P. 158; Richardson v. Strother, 55 Okla. 348, 155 P. 528; Bellamy, Adm'x, v. Bellamy, 93 Okla. 286, 220 P. 844; Vance v. Whitten, 51 Okla. 1, 151 P. 567; Cunningham, Adm'r v. Phillips, 4 Okla. 169, 44 P. 221; Scott v. Scott, 111 Okla. 96, 238 P. 468; Purdy v. Chambers, 128 Okla. 118, 261 P. 216; Miracle v. Jones et al., 141 Okla. 264, 284 P. 859. Jones, Comm. on Evidence (2d) vol. 5, sec. 2262, states: 'This view is concurred in by the majority of the courts.' In Barrows v. Alford, 129 Okla. 265, 264 P. 628, 630, it was stated: 'If the facts here do not establish a "communication had personally by such party," they undoubtedly come within the inhibition of "in respect to any transaction." The force of the statute cannot be avoided or circumvented. * * *' American Trust Co. v. Chitty, 36 Okla. 479, 129 P. 51; Nolan v. Mathis, 134 Okla. 79, 272 P. 868; Cooper v. Wood, 1 Colo. App. 101, 27 P. 884; Adams v. Morrison, 113 N. Y. 152, 20 N. E. 829.

" 'The prohibition * * * should be construed not only to prevent the introduction of direct proof of such transaction, but to prevent its proof by indirection as well.' Jones, Commentaries on Evidence, vol. 5, p. 4367, par. 2262.

"Departure was made from this rule as reflected in the third paragraph of the syllabus in Sinclair v. Stringer, 80 Okla. 218, 195 P. 771, wherein it was stated: 'In such an action testimony by the plaintiff that she worked in the home of the deceased as a practical nurse when the latter was at home and could not have been ignorant of such services, testimony as to the duration of such services, the reasonable value thereof, and that she had not been paid, is not testimony in respect to a transaction or communication had by her with a deceased person within section 5049, Rev. Laws 1910.'

"This latter statement has been repeated in the following cases: Miller, Adm'r, v. Nanny, 91 Okla. 150, 216 P. 662 (decision therein upon failure to object to the competency of witness rather than the testimony): Hutchings v. Winsor. Ex'x, 92 Okla. 37, 217 P. 1044 (therein the defendant merely negatived by his testimony any transaction had with deceased, thus denying the alleged transaction upon which the suit was based). 40 Cyc. 2317; 28 R. C. L. 497.

"This court expressly overrules the latter statement of the law, and announces that it will hereafter follow the former rule."

To like effect is the decision of the Supreme Court of Kansas in the case of Hoard v. Jones, supra.

4. The trial court, having heard the evidence and observed the demeanor of witnesses on the witness stand, decided the issues as against the plaintiff, and we are convinced after a careful examination of the evidence that the judgment of the trial court is correct. It is the general rule in this jurisdiction that in an action of purely equitable cognizance this court upon appeal will review and weigh the evidence, but the finding and judgment of the trial court will not be reversed unless found to be against the clear weight of the evidence. The judgment of the trial court is therefore affirmed.

The Supreme Court acknowledges the aid of Attorneys Paul B. Mason, Garrett Logan, and Whit Y. Mauzy in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Mason and approved by Mr. Logan and Mr. Mauzy, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and RILEY, BUSBY, PHELPS, and GIBSON, JJ., concur